# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39917 (f rev)**

———————————

**UNITED STATES**
*Appellee*

v.

**Deontre M. WHITE**
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 10 June 2022

———————————

*Military Judge:* Thomas J. Alford; Dayle P. Percle (remand).

*Sentence:* Sentence adjudged on 17 January 2020 by GCM convened at Joint Base San Antonio-Lackland, Texas. Sentence entered by military judge on 2 April 2020 and reentered on 9 September 2021: Bad-conduct discharge, confinement for 4 months, reduction to E-1, and a reprimand.

*For Appellant:* Major Mark J. Schwartz, USAF; Captain David L. Bosner, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and ANNEXSTAD, *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court, in which Judge ANNEXSTAD joined. Chief Judge JOHNSON filed a separate opinion dissenting in part and in the result.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

KEY, Senior Judge:

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of one specification of abusive sexual contact and two specifications of communicating indecent language in violation of Articles 120 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 934.[1] The specifications pertained to offenses Appellant was charged with committing in 2017 and 2018.[2] The military judge sentenced Appellant to a bad-conduct discharge, confinement for four months, reduction to the grade of E-1, and a reprimand.

Appellant's case is before us for a second time. Appellant raised eight issues when this case was originally presented to us, one of which asserted that the convening authority erred by not taking action on his sentence as required by Executive Order 13,825, § 6(b), 83 Fed. Reg. 9889, 9890 (8 Mar. 2018), and Article 60, UCMJ, 10 U.S.C. § 860, *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*). We remanded his case to the Chief Trial Judge, Air Force Trial Judiciary, for corrective action. *See United States v. White*, No. ACM 39917, 2021 LEXIS 400, at *7–8 (A.F. Ct. Crim. App. 10 Aug. 2021) (unpub. op.).[3] The convening authority subsequently approved Appellant's sentence, resulting in a new entry of judgment. Now that this error has been corrected, we turn to the remaining seven issues Appellant has raised: (1) whether the military judge abused his discretion in permitting the Government to introduce evidence regarding a digital image Appellant sent to the victim named in the abusive sexual contact specification; (2) whether his conviction of abusive sexual contact is factually sufficient; (3) whether his convictions of communicating indecent language are legally and factually sufficient; (4) whether his sentence is inappropriately severe; (5) whether his reprimand impermissibly referred to the three people who heard Appellant's purportedly indecent

---

[1] References to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise specified, all other references to the UCMJ, the Military Rules of Evidence, and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The military judge acquitted Appellant of four specifications alleging sexual assault and one specification alleging abusive sexual contact under Article 120, UCMJ, 10 U.S.C. § 920. The convening authority withdrew and dismissed two additional specifications of abusive sexual contact after arraignment. None of these seven specifications involved the victim in the abusive sexual contact specification of which Appellant was convicted.

[3] That opinion erroneously indicated Appellant had been convicted of *aggravated* sexual contact.

language as "victims;" (6) whether the military judge erred by permitting the Government to introduce evidence of an uncharged allegation that Appellant sexually assaulted another person; and (7) whether trial counsel committed prosecutorial misconduct by prosecuting the indecent language specifications.[4]

We conclude Appellant's convictions for communicating indecent language are legally and factually insufficient. Accordingly, we set aside the findings of guilty to Charge II and its two Specifications. We reassess Appellant's sentence to a bad-conduct discharge, confinement for three months, and reduction to the grade of E-1. By virtue of this reassessment, issue (5) is rendered moot. Finding no other error materially prejudicial to Appellant's substantial rights, we affirm the remaining finding of guilt.

## I. BACKGROUND

Appellant's convictions for abusive sexual contact and communicating indecent language arose from him touching another servicemember's leg and reading a poem to several noncommissioned officers.

## A. Abusive Sexual Contact

Appellant was a diet therapy technician assigned to the hospital on Fort Sam Houston, Texas. CD was an Army nutrition specialist who was also assigned to the hospital. CD reported for duty there in November 2017, and she met Appellant early that month when she went with him and two other servicemembers to a local nightclub one Saturday night. At Appellant's court-martial, CD acknowledged she had danced with Appellant at the club, to include "grinding" on Appellant's body and rubbing her buttocks into his groin area. The following Monday morning, Appellant and CD ran into each other at the hospital's dining facility, and Appellant asked CD about going to the gym that evening. CD handed Appellant her phone so that he could call his own phone in order to exchange their phone numbers.

According to text messages admitted in evidence at trial, Appellant and CD exchanged brief messages over the next three weeks, generally pertaining to going to the gym and Appellant twice asking CD if she would like to watch a movie. The wording of the messages suggests Appellant and CD had other conversations outside of the text messages, but the record is unclear whether they

---

[4] Appellant personally raises issues (6) and (7) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have carefully considered these two issues and conclude neither warrants discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

were telephonic, face-to-face, via other electronic means, or some combination of the foregoing. CD said that, at a minimum, she had given Appellant her Snapchat contact information at some point.[5]

CD testified that, in the morning of 5 December 2017, she told Appellant about how the light in her dormitory room bathroom was not working, and she asked if he could help her change it. She said she asked him because she knew he was the dormitory council president and she assumed he could assist with such matters. Appellant agreed to help, but that he would change the bulb the following day.

Just before 1300 hours on 5 December 2017, CD texted Appellant: "Bulb by fridge." Later that afternoon, according to CD's testimony, Appellant sent CD an animated image via Snapchat of a woman wearing panties with the words "eat me" on them. CD said she wrote back, "Is that what you're into?" She further testified Appellant responded "that's what he'll be doing tonight," and she replied, "okay." CD testified that she did not think the image was "geared towards" her and that she "had no inclination" that his response of "what he'd be doing tonight . . . was with [her] in mind." Nonetheless, she said the exchange made her "uncomfortable" because she did not think her relationship with Appellant was such that "he would have felt comfortable enough to express himself this way with [her]." A short while later, Appellant called CD to tell her he would stop by her room that evening on his way to a basketball game he was playing in rather than coming by the next day as he originally planned.

CD's dormitory bedroom was separate from her bathroom, and both opened into a common kitchenette area. Anticipating Appellant's arrival, CD placed a chair in the common area for Appellant to stand on and she extended the deadbolt on her open bedroom door so that her door would remain ajar. CD stayed in her room, but she heard Appellant trying to change the bulb. After some time passed, Appellant opened CD's bedroom door, told CD he was unable to fix the light, and placed the chair inside her bedroom. At the time, CD—who was wearing shorts and a t-shirt—was sitting on her bed with her laptop trying to connect to the Internet. She told Appellant she was having trouble doing this, and Appellant offered to connect her computer to his Internet service. CD accepted the offer and Appellant walked over and input his credentials while CD remained sitting on the bed.

Standing in front of CD, Appellant then put his hand on "the inner part of [her] knee, on the side." CD testified she "pushed him off right then" and said, "[H]ey, I don't want you touching me like that." Appellant "chuckled" and

---

[5] Snapchat is a messaging platform in which messages and images are automatically deleted after they are read or otherwise expire.

"moved back" for "a few seconds" but then "moved closer again" and put his hand on CD's "inner thigh . . . further up on the same leg." CD picked up a pen off the bed and pointed it towards Appellant, telling him, "[H]ey, you might need to leave right now because it might get ugly." Appellant "laughed for a little bit" and then left CD's room.

Just after Appellant left, he texted CD, "Lol" at 1854 hours, leading to the following exchange:[6]

> [CD:] What?
>
> [Appellant:] You
>
> [CD:] What about me?
>
> [Appellant:] You know what's up. You do a lot of talking
>
> [CD:] You already know this is not that kinda party
>
> [Appellant:] I don't know. But it won't happen again lol
>
> [CD:] Yup . . . I'm going to bed, we'll talk tomorrow

The next morning, CD was talking to two of her co-workers at the hospital when Appellant walked up. CD testified that Appellant said good morning to the other two but "rolled his eyes at [her] and looked at [her] in a mean manner," leaving CD "confused" because she perceived Appellant as behaving like she had done "something wrong to him." Four months later, in March 2018, CD decided to tell her supervisor, Staff Sergeant (SSgt) HH, what had occurred, and SSgt HH assisted CD in reporting the events to military officials.

## B. Communicating Indecent Language

### 1. Poetry Reading at Appellant's Medical Appointment

Around 0745 hours on 2 August 2018, Appellant went to the family health clinic on Fort Sam Houston for a physical therapy appointment where he was checked in by SSgt CR.[7] Appellant did not have any significant relationship with SSgt CR, although he had met her on at least two occasions at the clinic and Appellant asked her to review some "bullets" for him during the second occasion.[8]

---

[6] We quote text messages between Appellant and CD verbatim to include punctuation errors.

[7] SSgt CR had separated from the Air Force by the time of Appellant's court-martial.

[8] The record does not establish the nature of these "bullets," but trial defense counsel suggested during the Defense's closing argument that the bullets pertained to an enlisted performance report Appellant was writing.

SSgt CR escorted Appellant back to the exam room where she took Appellant's vital signs while making "small talk" with him, as she routinely did with patients. Appellant then asked SSgt CR if she liked poetry and if she would like to hear a poem he had written. SSgt CR said, "sure," and Appellant began reading. As Appellant read the poem, SSgt CR perceived that it "was very sexually explicit," so she stopped Appellant and told him, "I'm sorry. I did not realize the contents of this poem." SSgt CR testified that she thought the poem was about "a sexual encounter that he had with a woman," but she did not have any impression regarding whether the encounter was portrayed as consensual or not. At Appellant's court-martial, SSgt CR only recalled two brief excerpts from the poem. The first was, "just stick the tip in," and the second was, "[m]y hands down her pants touching her clitoris."

Once he stopped reading the poem, Appellant told SSgt CR that he had read the poem to a friend of his who told him "the poem sounded a lot like rape," and so he had revised it after receiving that feedback. At the time, SSgt CR had heard rumors that Appellant was facing allegations of sexual assault, but she "did not know for sure." She asked him "what would inspire him to write something like this," and she said Appellant replied by saying "that he was just working through some stuff that he was going through right now." The remainder of the appointment proceeded without incident, and SSgt CR said that—other than the poem—there was nothing out of the ordinary about the appointment. Trial counsel asked SSgt CR whether she thought Appellant's poetry reading was appropriate or inappropriate based upon "what [she] know[s] of Air Force culture." SSgt CR replied, "Inappropriate."

After the appointment, SSgt CR called an Airman who works in the same area of the clinic and who was friends with Appellant. SSgt CR told her that if Appellant returned to the clinic, the Airman should leave the exam room door open or have a second person in the room with her in order to deter Appellant from repeating his conduct.

### 2. Poetry Reading in Appellant's Duty Section

Later that same morning, in an office elsewhere in the hospital to which Appellant had been reassigned, Appellant began reading a poem—presumably the same poem he read to SSgt CR. Appellant had previously read some of his writings at work, which one of his co-workers variously described as poems, "freestyle," and "rap." This co-worker, Technical Sergeant (TSgt) SD, said she thought the first poem she heard Appellant recite "was really good," and she told Appellant so at the time.

As for the 2 August 2018 reading, TSgt SD did not recall if Appellant asked her to listen to the poem or if her husband, SSgt SD, who worked in the same area, told her to come listen to Appellant read it. TSgt SD testified that she

and SSgt SD were there for the reading, as well as her supervisor TSgt M and her co-worker SSgt EG. Before he began reading, Appellant told the group that the poem "could be read from either a female's perspective or a male's perspective." Once Appellant said the word "clitoris," TSgt SD walked away because she felt uncomfortable and "didn't want to be around that." TSgt SD did not say how long she listened to the poem, but she described the portion she heard as "quick." According to TSgt SD, TSgt M was present when Appellant first started reading, but stepped away "at some point."[9]

SSgt EG testified that it was SSgt SD who asked her (SSgt EG) to come hear the poem. SSgt EG said the reading was "[n]ot very long . . . . a minute maybe" and that "[w]hen [Appellant] got to the part that [she] felt was inappropriate, [she] said, 'uh, that's inappropriate,' and he stopped." She testified she walked away from Appellant at the same time TSgt SD did, leaving Appellant standing with SSgt SD who was "uncomfortably laughing." According to SSgt SD, Appellant's reading "maybe lasted 30 seconds," and SSgt SD said he was the one who told Appellant to stop reading after somebody said, "[Y]ou can't say that at work or in the work environment."

TSgt SD, SSgt SD, and SSgt EG all had slightly different recollections of what Appellant's poem was about, and none remembered much of the specific language Appellant actually used. TSgt SD testified that, from what she remembered, "the poem was about either a male or a female having sexual intercourse with someone who is saying no, but they're continuing to pursue this person sexually." TSgt SD said she interpreted the poem to be about rape or sexual assault. SSgt SD, however, thought the poem was about a man and a woman "dancing with each other and essentially like the female didn't want to dance or do whatever they were doing anymore" and the female "wanted the guy to stop." SSgt EG just remembered there being "some talk about sex acts in the poem . . . . talking about sex; like actually having sex."

In terms of the exact words Appellant used, TSgt SD remembered Appellant saying "breast" and "clitoris." She did not remember what the male in the poem was doing with the woman's breast, but she thought there "was contact." TSgt SD initially testified that she could not remember what the male was doing with the woman's clitoris, leading trial counsel to ask her, "Do you remember him saying he was rubbing her clit?" TSgt SD answered, "Now that you say that, I think that's what he said." For his part, SSgt SD said he remembered the poem saying the male was touching the female's "vagina." TSgt EG did not remember any particular words from the poem at all.

---

[9] TSgt M did not testify at Appellant's court-martial.

TSgt SD testified that she was "surprised and disgusted" by the poem and "some of the terms that [Appellant] was using and the nature of the poem." She said, "For one, where he was doing it at was inappropriate for the work section; and, two, it was just inappropriate altogether." She explained that she was disgusted because "the poem was, in [her] perspective, about raping someone because they're saying no and you're continuing to physically touch that person." Trial counsel asked TSgt SD if the poem was "grossly offensive" to her, and she answered, "Yes." SSgt SD said he was "[j]ust a little taken aback because it wasn't what he usually—what [Appellant's] poems were about." SSgt EG testified that once she "realized the nature of the poem," she was "uncomfortable." She then offered, "It's not really appropriate to talk about sex that way, I guess, at work between like subordinates and [a noncommissioned officer]." Trial counsel asked SSgt EG if the language in the poem was "offensive" to her, and she answered, "Yes."

In TSgt SD's opinion, Appellant's reading of the poem "was detrimental to the morale in the unit and good order and discipline." Explaining her basis for this conclusion, TSgt SD testified,

> For one, speaking in the manner that he did it makes it seem like it's okay to speak like that; make sexual comments like that in the workplace. At that point it affected our relationship because I didn't want to, you know, associate myself with him or speak to him at that point just because I didn't know what he would say.

When SSgt EG was asked how the reading affected good order and discipline in the unit, she answered, "It's hard to say." She explained that while inappropriate, the reading "didn't bother [her]," but "[i]f you're making people that you work with uncomfortable and maybe someone doesn't have tough skin, that could break[ ]down like trust and stuff like that and being able to work and get the mission done."

### 3. Post-Reading Events and Appellant's Court-Martial

The day after Appellant read his poem to her, SSgt CR told the doctor in her clinic about what had occurred. During this conversation, the doctor confirmed that Appellant was, in fact, under investigation for allegations of sexual assault, leading SSgt CR to call Appellant's first sergeant to report what had occurred. SSgt CR conceded that if she had been friends with Appellant and if he had read the poem to her outside the workplace, she "probably would not have reported" the incident. As a result of SSgt CR's report, Appellant received a letter of reprimand on 17 August 2018 for the reading of the poem in the exam room.

8

After receiving the letter of reprimand, Appellant sought TSgt SD's advice on how to respond to it. During this conversation, TSgt SD told Appellant it was inappropriate of him to read the poem in the workplace, and she testified that "[h]e was very receptive and in [her] opinion remorseful." Trial defense counsel asked if it appeared as if Appellant "didn't know better," and she answered, "Yes." Also during this conversation, according to TSgt SD, Appellant claimed he warned SSgt CR before reading the poem that it was explicit, but that SSgt CR said she still wanted to hear it. SSgt CR, however, testified Appellant did not tell her what the topic of the poem was or that it would be explicit before he began reading.[10]

At Appellant's court-martial, the military judge applied a "recklessness" mens rea for the indecent language offenses. He also took judicial notice of excerpts from an Air Force Handbook (AFH) and an Air Force Instruction (AFI) at the Government's request and without defense objection. The first excerpt came from the non-punitive AFH 36-2618, *The Enlisted Force Structure*, ¶ 4.4.1 (5 July 2018). This paragraph indicates the responsibilities of junior enlisted Airmen include, *inter alia*, "exhibit[ing] professional behavior, military bearing, [and] respect for authority" and "[c]ontribut[ing] to a culture and climate of dignity and respect by supporting and enforcing a zero tolerance policy for sexual harassment, sexual assault, and discrimination." The second excerpt came from the punitive AFI 1-1, *Air Force Standards*, ¶ 1.7.4.5 (7 Aug. 2012, Incorporating Change 1, 12 Nov. 2014). This paragraph is titled "Sexual Assault Prevention and Response (SAPR) Program," and trial counsel asked the military judge to take judicial notice of this passage: "All Airmen have the enduring responsibility to foster a climate of dignity and respect and to promote and ensure a culture that will not tolerate sexual assault or behaviors that support it." In the Government's closing argument, trial counsel briefly referred to the AFH and AFI, arguing to the military judge:

> And that's the purpose of the two AFIs [sic] that the court has taken judicial notice of that talk about our Air Force culture and Air Force standards, and that compliance with it is mandatory, and all Airmen have to foster that climate of dignity and respect. There is nothing dignified and nothing respectful about reading a poem about rape to multiple NCOs who are trying to [do] their jobs in the workplace. He was on notice. He knew. And he was a junior Airman, even as a junior Airman he knew, because he knows what his responsibilities are in AFI 1-1. He knows what he is supposed to be doing, and he's supposed to be professional

---

[10] The letter of reprimand entered into evidence indicates Appellant ultimately waived his right to submit a response.

at all times and have respect for authority. It's not respectful for a Senior Airman to talk about rape to female NCOs to the point that they are so offended they walk away. That's obviously not respectful. As if you need AFIs to tell you that you can't talk about rape in the workplace, but to the extent that he didn't know, we've got AFIs out there that clearly tell him what he cannot be doing in the workplace.

## II. DISCUSSION

### A. Sufficiency of Appellant's Convictions

On appeal, Appellant challenges his conviction of abusive sexual contact as being factually insufficient while contending his indecent language convictions are both legally and factually insufficient. Related to his abusive sexual contact conviction, Appellant asserts the military judge erred in admitting testimony about the image Appellant sent CD via Snapchat before going to her room to try and fix her light bulb.

#### 1. Law

##### *a. Legal and Factual Sufficiency*

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The "[G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### b. Abusive Sexual Contact

As charged in this case, the Government was required to prove beyond a reasonable doubt that: (1) Appellant committed sexual contact on CD by unlawfully touching her inner thigh with his hand; (2) this contact amounted to bodily harm; (3) Appellant did so with the intent to gratify his sexual desire; and (4) the touching occurred without CD's consent. *See* 2016 *MCM*, pt. IV, ¶ 45.b.(7)(b). "Sexual contact" includes, *inter alia*, "any touching . . . either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(2)(B). "[A]ny offensive touching of another, however slight," amounts to bodily harm. 2016 *MCM*, pt. IV, ¶ 45.a.(g)(3). "Consent" is defined as "a freely given agreement to the conduct in issue by a competent person" and "[a]n expression of lack of consent through words or conduct means there is no consent." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8).

The defense of mistake of fact is available to Appellant so long as the circumstances as he mistakenly believed them to be would render his conduct non-criminal. If the mistake pertains to an element requiring specific intent, that mistake "need only have existed in the mind of [Appellant]." Rule for Courts-Martial (R.C.M.) 916(j)(1). If, however, the mistake pertains to an element requiring only general intent, Appellant's mistake must not only exist in his mind, but it also "must have been reasonable under all the circumstances." *Id*. Once this defense is raised, the Government must prove—beyond a reasonable doubt—the defense did not exist. R.C.M. 916(b)(1).

### c. Communication of Indecent Language

Appellant was charged with communicating indecent language to SSgt CR, TSgt SD, and SSgt SD, to wit: "sexually explicit poetry." This required the Government to prove that: (1) Appellant communicated certain language; (2) the language was indecent; and (3) under the circumstances, Appellant's conduct was to the prejudice of good order and discipline in the armed forces. *See* 2016 *MCM*, pt. IV, ¶ 89.b. "Indecent language" is defined as "that which is grossly

offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought." 2016 *MCM*, pt. IV, ¶ 89.c. "[T]he words allegedly uttered by the accused [need not] be indecent or obscene *per se*, for even 'chaste words may be made the medium of expressing obscene thought.'" *United States v. French*, 31 M.J. 57, 59–60 (C.A.A.F. 1990) (quoting *United States v. Wainwright*, 42 C.M.R. 997, 999 (A.F.C.M.R. 1970), *aff'd on other grounds sub nom. United States v. Perry,* 43 C.M.R. 23, 23 n.* (C.M.A. 1970)). "[H]owever, when the language involved is not indecent on its face, the necessary implication or innuendo of indecency must be clearly discernible from the four corners of the specification itself." *Wainwright*, 42 C.M.R. at 1000.

In order to qualify as indecent, the language "must violate community standards." *Id*. at 999; *see also United States v. Green*, 68 M.J. 266, 269 (C.A.A.F. 2010) (explaining that the requirement to violate community standards modifies the definition of "indecent language" and does not create a separate definition). The applicable community standards "are those of the military community, not those of an individual military unit." *United States v. Hullet*, 40 M.J. 189, 191 (C.M.A. 1994) (citation omitted).

"Indecent is synonymous with obscene." *United States v. Moore*, 38 M.J. 490, 492 (C.M.A. 1994) (internal quotation marks and citation omitted). Such language is not protected by the United States Constitution. *French,* 31 M.J. at 59; *United States v. Meakin*, 78 M.J. 396, 401 (C.A.A.F. 2019). The United States Supreme Court established "basic guidelines" for determining whether forms of expression amount to obscenity in *Miller v. California*. 413 U.S. 15, 24 (1973). These guidelines are: (a) whether "the work, taken as a whole, appeals to the prurient interest" when viewed through the lens of "the average person, applying contemporary community standards;" (b) "whether the work depicts or describes, in a patently offensive way, sexual conduct;" and (c) "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id*. (citations omitted).

The third element of this offense "refers only to acts directly prejudicial to good order and discipline and not to acts which are prejudicial only in a remote or indirect sense." 2016 *MCM,* pt. IV, ¶ 60.c.(2)(a). As explained in the *Manual for Courts-Martial*, "Almost any irregular or improper act on the part of a member of the military service could be regarded as prejudicial in some indirect or remote sense; however, this article does not include these distant effects. It is confined to cases in which the prejudice is reasonably direct and palpable." *Id*. The requirement to prove this third element "filters out from punishment language that is colloquial vocabulary and may be routinely used by service members." *United States v. Negron*, 60 M.J. 136, 144 (C.A.A.F. 2004).

### d. Evidence of Other Acts

Mil. R. Evid. 404(b)(1) generally prohibits the introduction of evidence that a person committed some "crime, wrong, or other act" for the purpose of proving that "person's character in order to show that on a particular occasion the person acted in accordance with the character." However, such evidence may be admissible when offered for some other purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Mil. R. Evid. 404(b)(2). If the evidence has any tendency to make a fact of consequence more or less probable, then the evidence is relevant. *See* Mil. R. Evid. 401. Even when evidence is relevant, a military judge may prohibit its admission when the evidence's probative value is substantially outweighed by such considerations as unfair prejudice, confusing the issues, and wasting time. *See* Mil. R. Evid. 403.

We review a military judge's decision to admit evidence over objection for abuse of discretion. *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citing *United States v. Phillips*, 52 M.J. 268, 272 (C.A.A.F. 2000)). In order for such a decision to amount to an abuse of discretion, it must be "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id.* at 166 (citing *United States v. Johnson*, 49 M.J. 467, 473 (C.A.A.F. 1998)). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted).

### 2. Analysis

#### a. Admission of the Snapchat Image

At trial, Appellant sought to exclude evidence of the image Appellant sent CD via Snapchat, but the military judge denied the Defense motion, reasoning that the evidence was relevant to show Appellant's motive, intent, and general state of mind, all of which pertained to the Government's obligation to prove Appellant's mens rea. In assessing the relevance of the evidence under Mil. R. Evid. 401, the military judge noted that the message was sent "shortly before" Appellant touched CD. In his consideration of Mil. R. Evid. 403, the military judge returned to this temporal guidepost, noting that the message was "close in time" to the touching.

On appeal, Appellant contends the military judge erred in concluding the image was relevant to his motive and intent under the theory that the message

might have pertained to someone other than CD.[11] In support of this theory, Appellant points to the fact CD did not think the message had anything to do with her. Appellant further argues that even if the message had some marginal relevance, that relevance was substantially outweighed by the danger of unfair prejudice.

One consideration in determining whether evidence of intent via an uncharged act is admissible under Mil. R. Evid. 404(b) is "whether Appellant's state of mind in the commission of both the charged and uncharged acts was sufficiently similar to make the evidence of the prior acts relevant on the intent element of the charged offense[ ]." *United States v. Hays*, 62 M.J. 158, 164 (C.A.A.F. 2005) (internal quotation marks omitted) (citing *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004)).

We conclude the military judge did not err in admitting testimony about the image which Appellant sent to CD via Snapchat. Appellant was charged with touching CD with the specific intent to gratify his sexual desires. As a result, the degree to which Appellant did or did not perceive CD as a potential sexual partner was squarely a fact of consequence in Appellant's trial. Similarly, the fact Appellant chose to send an overtly sexual image to CD tends to suggest Appellant had a sexual motive for doing so, such as trying to alert CD to his sexual desires or trying to create an opening for a conversation about sexual matters between CD and himself. The relevance of the evidence is somewhat diminished by the fact Appellant told CD it was what he would be doing "tonight," when the stipulation of expected testimony indicated Appellant did not go to CD's room until the following day. Nonetheless, the test for relevance is whether the evidence *has any tendency* to prove a fact of consequence, not whether the evidence conclusively establishes the fact.

Once relevancy is shown, the strength of the evidence is weighed against countervailing concerns under Mil. R. Evid. 403. Importantly, the probative value of the evidence must be *substantially* outweighed by one of those concerns before it become excludable. In this case, even if we were to only credit

---

[11] In support of the motion, the parties agreed to a stipulation of expected testimony for CD. According to the stipulation, Appellant sent the Snapchat message on 4 December 2017 and CD called him when she received it. The stipulation states, however, that Appellant did not go to CD's room until the following day. Based on this timeline, Appellant argues his comment about "what he'll be doing tonight" was entirely unrelated to CD, because "tonight" was 4 December 2017—the day before Appellant planned to go to and actually went to CD's room. When CD testified at Appellant's trial, however, she said the Snapchat-related exchange happened the same day Appellant came to her room (she also testified she "wrote" Appellant as opposed to calling him). We assess the military judge's ruling in light of the stipulation, which was the evidence before him at the time he considered the motion.

the testimony about the image as having slight probative value, we would still not find that value substantially outweighed by the danger of unfair prejudice. Appellant's primary contention is that the evidence was unfairly prejudicial because it allowed the Government to argue he had a prurient state of mind when he touched CD. The subject of Appellant's communication with CD, however, was circumstantial evidence of Appellant's mens rea, which was an element of the offense with which he was charged. Thus, while the evidence may have been prejudicial to Appellant, we see no colorable argument that it was unfairly prejudicial. Moreover, we see no indication that in this judge-alone trial, the military judge considered this evidence for any purpose other than those he identified on the record. A military judge is presumed to know the law, follow the law correctly, and separate out inadmissible and inappropriate evidence when deciding an accused's guilt, innocence, or sentence. *See United States v. Sanders,* 67 M.J. 344, 346 (C.A.A.F. 2009) (per curiam); *United States v. Mason,* 45 M.J. 483, 484 (C.A.A.F. 1997) (per curiam). As a result, we conclude the military judge did not abuse his discretion in admitting evidence pertaining to Appellant's Snapchat message.

### b. Abusive Sexual Contact

Appellant attacks the factual sufficiency of his conviction for touching CD's inner thigh on two grounds. First, he argues there is insufficient evidence to conclude he acted with an intent to gratify his sexual desire, as opposed to touching CD for some other, non-criminal purpose, such as "playfulness or joking." Second, he argues the Government failed to prove Appellant did not have a valid mistake of fact defense.

In support of his first argument, Appellant points to the fact he was laughing at the time he touched CD and that he sent her a text reading "Lol" immediately afterwards, which—according to Appellant—suggests not a sexual purpose, but rather a joking one. Alternatively, Appellant asserts the evidence might indicate he was simply touching CD for a flirtatious or probing purpose—that is, to see if she would be willing to engage in more overtly sexual conduct.

For Appellant's claim of mistake of fact, he points to his dancing with CD several weeks earlier, the fact they exchanged phone numbers and texted each other, CD inviting him to her room to fix a light bulb, and the ambiguous way in which CD responded to the "eat me" image. Appellant contends "[i]t is reasonable to believe he thought [CD] would be receptive to commencing some type of sexual relationship," such that he believed she would consent to him touching her, and the Government failed to prove this was not the case.

We have previously concluded that the offense of abusive sexual contact committed by causing bodily harm is "highly analogous" to the general-intent

offense of sexual assault committed by causing bodily harm. *United States v. Lee*, No. ACM 39531 (f rev), 2020 CCA LEXIS 61, at *20–21 (A.F. Ct. Crim. App. 26 Feb. 2020) (unpub. op.), *rev. denied,* 80 M.J. 196 (C.A.A.F. 2020). The difference between those two offenses is that the abusive sexual contact offense includes an additional element calling for a specific intent. As charged here, the additional element is that Appellant had the specific intent to gratify his sexual desire when he touched CD. The element to which CD's consent is pertinent, however, is the "bodily harm" element insofar as that element operates to criminalize offensive, or non-consensual, touching.[12] Therefore, any mistake of fact related to CD's lack of consent must have been both honestly held by Appellant and objectively reasonable. Any mistake of fact related to whether Appellant was acting with the specific intent to gratify his sexual desire, however, need only have existed in Appellant's mind.

When Appellant first touched CD's knee, she "pushed him off" and told him she did not want him "touching [her] like that." Appellant then touched her inner thigh. Appellant is not charged with any offense related to him first touching CD's knee. This is significant, because whatever can be said about Appellant's impression of CD's consent when he first touched her, Appellant was under no misapprehension of her non-consent by the time he touched her thigh. At that point, CD had not only pushed Appellant away, but she had squarely told him she did not want him touching her. Despite this unambiguous expression, Appellant touched her again. We see no credible argument that Appellant was honestly mistaken about her consent by the time he touched her thigh, much less that any such mistake would have been reasonable under the circumstances presented here.

The more relevant question is whether the Government proved Appellant had the requisite specific intent to gratify his sexual desires when he touched CD's inner thigh. We conclude the Government did. Appellant sent CD an image via Snapchat with plain sexual connotations. Perhaps recognizing the suggestive nature of the image, Appellant elected to send it via a platform which would delete the image shortly after CD saw it, rather than by standard text message, as he had used for previous communications with CD. When confronted by CD about the image, Appellant told her "that's what he'll be doing tonight," removing any ambiguity about the image's sexual overtones and—by extension—his purpose in sending it. Not long after sending the image, Appellant placed his hand on CD's knee. After being rebuffed in no uncertain terms, Appellant touched her again. This time, he placed his hand on her inner thigh such that his had was, according to CD's testimony, mere inches from her vaginal region. Perhaps we would conclude Appellant might have had some non-

---

[12] The Government also charged "without consent" as a separate element of the offense.

sexual purpose for touching CD had he put his hand on her shoulder or her elbow, but the inner thigh is commonly recognized as an overtly sexual area of the human body. Buttressing this assessment, we note that a different provision in Article 120, UCMJ, identifies specific body parts by which abusive sexual contact may be committed: "the genitalia, anus, groin, breast, *inner thigh*, or buttocks of any person." 10 U.S.C. § 920(g)(2)(A) (2016 *MCM*) (emphasis added). The election to place "inner thigh" among these other body parts indicates Congress' view that a person's "inner thigh" is an area with heightened sexual connotations.

We also find telling Appellant's text message exchange with CD after he left the room. CD texted him, "You already know this is not that kinda party," which we interpret—in conjunction with CD's earlier statement about not wanting Appellant to touch her "like that"—as CD saying that she was not sexually interested in Appellant. Appellant's response, "I don't know" and then promising he would not do it again suggests he might have been unclear with respect to CD's degree of interest in him, further pointing to Appellant's sexual purpose in touching CD's thigh. Taking all the evidence in consideration, we conclude Appellant touched CD's inner thigh with the specific intent to gratify his sexual desires. Thus, having carefully reviewed the evidence in this case, we are convinced of Appellant's guilt of abusive sexual contact beyond a reasonable doubt.

### c. Communicating Indecent Language

We conclude the findings of guilty for the two indecent-language specifications are neither legally nor factually sufficient. We first note the dearth of evidence in the record establishing what Appellant actually said when he read his poem. The witnesses tend to agree the Appellant was describing some sort of sexual encounter. TSgt SD thought the poem described a sexual assault in that it involved "someone who is saying no." SSgt SD recalled the poem being about two people dancing with each other, but that "the female didn't want to dance or do whatever they were doing anymore." He recalled the female in the poem "wanted the guy to stop" and that the male was touching the female on her "vagina." SSgt CR said the poem was about a sexual encounter, but she could not say whether the encounter was portrayed as being consensual or not. SSgt EG also did not offer an opinion about consent or the lack thereof, just saying that the poem involved "some talk about sex acts." According to SSgt CR, Appellant told her that a friend of his told him that an earlier draft of the poem "sounded a lot like rape."

The witnesses' recollection of the exact language Appellant used was varied, with SSgt CR recalling Appellant saying "just stick the tip in" and "[m]y hands down her pants touching her clitoris." TSgt SD only remembered two words: "breast" and "clitoris." SSgt SD said Appellant used the word "vagina."

Viewing the evidence in the light most favorable to the Prosecution, it appears Appellant described sexual conduct in a somewhat detailed, if not explicit, fashion. Drawing every possible inference in the Government's favor, Appellant's poem could be understood to describe nonconsensual sexual contact. What there is no evidence of, however, is the overall tone or theme or even the point of the poem. That is, there is nothing in the record that indicates whether the conduct described in the poem was presented in a way designed to sexually excite a listener, to describe the behavior in a negative light, or to serve as a metaphorical condemnation of sexual misconduct.

The words themselves fall far short of being "grossly offensive to modesty, decency, or propriety" or that they "shock[ ] the moral sense, because of [their] vulgar, filthy, or disgusting nature," especially insofar as the few words the witnesses recalled are medically correct anatomical terms. The only arguably coarse term that appears in the record is the slang word "clit" as shorthand for "clitoris," but that word was only uttered by trial counsel in a leading question, not by any of the witnesses. Conceptually, any discussion of erogenous parts of the body might tend to incite lustful thought, but there is no indication such was intended or occurred here, nor are we willing to broadly paint any description of sexual conduct among adults as amounting to indecent language under a theory that someone, somewhere might be aroused by it. Instead, the evidence must demonstrate the language runs so afoul of community standards that it is "grossly offensive to modesty, decency, or propriety" or shocking to "the moral sense" because it is "vulgar, filthy, or disgusting" or tends "to incite lustful thought." As our sister court has explained, "Grossly . . . is a word suggestive of language with an extreme meaning or purpose. At its root, the word gross is synonymous with glaring, flagrant, or monstrous. Language with a tendency to incite lustful thought is generally uttered for that very purpose." *United States v. Avery*, ARMY 20140202, 2017 CCA LEXIS 739, at \*23 (A. Ct. Crim. App. 30 Nov. 2017) (unpub. op.) (footnotes and quotation marks omitted), *aff'd*, 79 M.J. 363 (C.A.A.F. 2020). None of the words, whether taken alone or together, approximates these standards.

We have held that even when the language at issue is not *per se* indecent, the context of the utterance may render it indecent. *United States v. Knarr*, 80 M.J. 522, 532 (A.F. Ct. Crim. App. 2020), *rev. denied*, 80 M.J. 348 (C.A.A.F. 2020). In *Knarr*, the "context" was the accused had sent song lyrics strongly suggestive of sexual conduct to a person whom the accused believed was a 14-year-old girl—the same person the accused had previously expressed his sexual desires to and sought nude photographs from. *Id.* Similarly, the United States Court of Appeals for the Armed Forces (CAAF) found an accused's "statement" of "mmmm-mmmm-mmmm" to a female co-worker to be indecent as such was accompanied by him pulling down her shirt and looking at her

breasts after he had previously made sexual overtures to her and shortly afterwards rubbed his pelvic region on her buttocks. *Green*, 68 M.J. at 270. In another case, the CAAF upheld an indecent-language conviction based upon the accused's "innocuous" words asking to get in bed with his 15-year-old stepdaughter—when the accused had already told her that he had been having sexual fantasies about her—because "the language certainly conveys an indecent message." *French*, 31 M.J. at 60.

No such context can be found in Appellant's case. All we know is a friend of Appellant's told him his poem sounded like it described a rape, and Appellant made some unknown modifications to the poem. Appellant began reading it to SSgt CR until she said, "I'm sorry. I did not realize the contents of this poem." It wasn't until the reading in Appellant's workplace that there is any evidence of anyone telling Appellant that the poem was inappropriate for the work environment. We see nothing that would indicate Appellant read his poem with an eye towards inciting lustful thought or in an attempt to advance some inappropriate relationship with any of the listeners. None of the listeners testified Appellant had engaged in any other inappropriate conduct, and Appellant apparently stopped reading the poem on both occasions when the listeners said they did not want to hear more, suggesting Appellant incorrectly assumed he had found interested audiences. TSgt SD agreed that when Appellant approached her after he had been reprimanded, it seemed as if he "didn't know better," but the evidence also indicates Appellant was less than forthright when he claimed he warned SSgt CR about the poem being explicit. Thus, Appellant—at least after having been reprimanded—perceived the potentially concerning nature of the poem. This "context," however, does not render Appellant's speech indecent under the *Manual*'s standard.

SSgt CR said she was "shocked" by the poem, but she also conceded that if a friend of hers—as opposed to Appellant, who was not a friend—read the same poem to her in a different setting, she would not have found the reading worthy of reporting. TSgt SD said she was "surprised and disgusted" and found the poem "grossly offensive" to her, but SSgt SD only said he was "[j]ust a little taken aback." SSgt EG said she found the poem offensive, but she also testified the reading "didn't bother" her. The standard for indecent language is not a subjective one, however. The question is not whether some of the listeners in this case were personally offended, but whether the language violates the standards of the military community at large. While those who listened to Appellant's poem may provide some indication of where the larger military's standards lie, their opinions are not determinative. Even the testimony of these witnesses was inconclusive, as only TSgt SD answered "yes" when trial counsel asked, "Was the poem grossly offensive *to you*?" (Emphasis added). No other witness said the poem was "grossly offensive" to them or otherwise. The

witnesses generally coalesced around the idea that reading the poem was inappropriate, but there are a great many things which are inappropriate in the workplace which fall short of indecency.[13]

Beyond the failure of the evidence to establish that Appellant's language was indecent, the record is also inadequate to support a conclusion that Appellant's conduct amounted to "direct and palpable" prejudice to good order and discipline. To the contrary, Appellant's conduct seemingly had virtually no impact on good order and discipline. At the most, SSgt CR reported what had occurred to her supervisory doctor and Appellant's first sergeant and told an Airman in her clinic to keep her door open or have another person present should Appellant return.[14] The listeners in Appellant's workplace returned to work after the episode and apparently did not report the incident at the time, considering Appellant's reprimand only concerned the reading during his medical appointment. TSgt SD said she thought Appellant's reading of the poem "was detrimental to the morale in the unit and good order and discipline," but all she could offer on that point was that she personally did not want to associate with or speak to Appellant "at that point." This concern apparently evaporated shortly thereafter, considering that within just two weeks she was willing to sit down with Appellant and discuss the matter with him in the context of providing him advice on responding to the reprimand he had received.

Although the Government sought to elicit evidence from the listeners about the impact Appellant's reading had on good order and discipline, the witnesses struggled to provide such. TSgt SD said, "speaking in the manner that he did it makes it seem like it's okay to speak like that." SSgt EG said she was not personally bothered, but Appellant's conduct "*could* break[ ]down like trust and stuff like that and being able to work and get the mission done." (Emphasis added). Such amorphous speculation falls well short of proving actual and direct prejudice to good order and discipline. We further note that all of the listeners to Appellant's poetry readings were noncommissioned officers senior to Appellant, somewhat diminishing the likelihood of any prejudice to good order and discipline. By virtue of their grade superiority over Appellant, they had the authority and ready ability to correct Appellant's behavior on the spot.

---

[13] The Air Force Handbook and Air Force Instruction the military judge took judicial notice of are geared towards healthy work environments and would counsel against a wide swath of counterproductive behaviors, indecent or otherwise. They provide little guidance in determining whether Appellant's speech was indecent or not. Even trial counsel reverted to characterizing Appellant's conduct as being unprofessional and disrespectful during the Government's closing argument, as opposed to being indecent.

[14] SSgt CR testified that hospital personnel were readily available to assist with such requests.

As a result, we conclude Appellant's convictions for communicating indecent language are legally and factually insufficient. This conclusion should not be read to endorse Appellant's conduct or to suggest sexually explicit poetry is appropriate for the military workplace. To be sure, conducting an on-duty reading of an erotic passage from Vladimir Nabokov's *Lolita* would be no more appropriate, but there is a gulf between what is inappropriate and what is illegally indecent. In reading his poems, Appellant may have committed other offenses, but under the facts presented here, the Government failed to prove Appellant communicated indecent language under Article 134, UCMJ.

## B. Severity and Reassessment of Appellant's Sentence

Shortly after Appellant's court-martial, trial defense counsel submitted a petition for clemency asking the convening authority to grant Appellant "some leniency in terms of his forfeitures."[15] In his initial assignment of errors, Appellant argued his sentence was inappropriately severe, pointing to his difficult childhood, his otherwise exemplary duty performance, and his view that the conduct underlying his convictions was "relatively minor." Appellant asked us to "modify" his sentence, but did not specifically identify in what way.

Because the convening authority took "no action" on Appellant's sentence, this court remanded Appellant's case and permitted a detailed military judge to take remedial measures, including returning the record to the convening authority to take action. We presume the military judge selected this option, as the convening authority subsequently signed a new Decision on Action memorandum in which she approved Appellant's sentence as adjudged. In doing so, the convening authority permitted Appellant to submit additional matters in clemency. Appellant availed himself of this opportunity and explained to the convening authority that—as a result of his conviction for abusive sexual contact—he is now a registered sex offender in Texas, subject to myriad restrictions and reporting requirements. Appellant asked the convening authority to disapprove his reduction in grade and his confinement, as well as recommend to this court that his punitive discharge be disapproved.

When Appellant's case was returned to us, Appellant supplemented his original assignment of error, arguing the conditions of his sex-offender registration further rendered his sentence inappropriately severe and that we should set aside his bad-conduct discharge as a remedy. We also permitted Appellant to submit additional details about his sex-offender status to this

---

[15] Appellant was not sentenced to forfeit any pay or allowances, but the convening authority retained the power to defer Appellant's automatic forfeitures during his confinement until judgment was entered.

court, but we deferred ruling on whether we could consider such post-trial matters. Appellant argued that because his registration conditions were included in his second clemency submission, they are part of the record and may be supplemented with post-trial information pursuant to *United States v. Jessie*, 79 M.J. 437, 445 (C.A.A.F. 2020).

The Government responds to this argument by saying the convening authority was never given permission on remand to seek input from Appellant, so Appellant's second clemency submission is "void." Building on this premise, the Government argues there is nothing in the record about Appellant's requirement to register as a sex offender, so *Jessie* prohibits our consideration of post-trial information on that point. The Government further contends that Appellant's registration requirement is a "collateral consequence" which should not factor into our Article 66, UCMJ, analysis.[16]

We review issues of sentence appropriateness de novo. *See United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to review a case for sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to, considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d)(1), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citations omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

Our review under Article 66(d)(1), UCMJ, is generally confined to matters found in the record of trial. *Jessie*, 79 M.J. at 444. We conclude that when a

---

[16] The Government asks us to "clarify" a footnote in *United States v. Parker* in which this court wrote: "We do not specifically hold that the consequences of sex offender registration are a matter this court must consider in its sentence appropriateness determination. We merely elected to give this matter appropriate weight in this case, recognizing both our broad and highly discretionary authority under Article 66(c), UCMJ, . . . to review sentences and the nature of sex offender registration as a collateral consequence." 73 M.J. 914, 920 n.6 (A.F. Ct. Crim. App. 2014). The appellant in *Parker* received no relief from his sentence.

convening authority offers an appellant a second opportunity to submit matters in clemency in deciding whether to take action on a case, such matters are considered to be attached to the record.[17] While the convening authority was not obligated to give Appellant this second opportunity, the fact of the matter is that she did, and we will not penalize Appellant by disregarding his second clemency submission, as the Government would have us do. Based upon the unique facts presented here, we will assume, without deciding, that the matters submitted by Appellant on appeal pertain to an issue raised in the record, but not fully resolvable by the record alone, insofar as they provide additional detail about Appellant's registration requirements.[18] *See id.* at 445.

The question we must answer is whether we are permitted to consider Appellant's requirement to register as a sex offender and the consequences he must suffer as a result. We conclude that when evidence of an appellant's sex-offender registration is included in the record, we may consider it. Article 66(d)(1), UCMJ, charges us with making our determinations regarding findings and sentences "on the basis of the entire record," and nothing in the UCMJ indicates any particular matters are "off limits." To the contrary, *not* considering matters in the record would likely run afoul of Appellant's "substantial right" to a complete Article 66, UCMJ, review. *See United States v. Chin*, 75 M.J. 220, 222 (C.A.A.F. 2016) (stating that in conducting this review, the Courts of Criminal Appeals "may not rely on only selected portions of a record"). The sole prerequisite to our consideration of matters related to a case is that they appear in the record, and clemency matters filed by the accused are attached to the record pursuant to R.C.M. 1112(f)(3).

Although we consider the fact—based upon matters in the record—that Appellant is a registered sex offender in Texas with various attendant restrictions and requirements, we attribute little weight to that fact. This is due, in part, to sex-offender registration processes being creatures of federal and state legislatures and regulatory agencies, wholly outside the purview of the military justice system, if not the entire Department of Defense. We are well aware of the competing views in the debate over whether registration conditions amount to punishment or not. *See, e.g., United States v. Price*, 777 F.3d 700, 704 (4th

---

[17] We recognize the plain language of R.C.M. 1106(d)(4) prohibits the convening authority from granting an extension for the submission of clemency matters by more than 20 days, but we see nothing in the rule prohibiting a convening authority from considering matters received outside of that timeframe. We further note the record is not otherwise entirely silent as regarding Appellant's sex-offender status, as the entry of judgment also reflects sexual-offender notification indexing is required.

[18] The additional matters include documentary confirmation that Appellant is, in fact, a registered sex offender in Texas, and a short declaration from Appellant describing some of the attendant restrictions and reporting requirements.

Cir. 2015) (describing the federal Sex Offender Registration and Notification Act as "a non-punitive, civil regulatory scheme, both in purpose and effect"); *United States v. Talkington*, 73 M.J. 212, 218 (C.A.A.F. 2014) (Baker, C.J., concurring) (concluding sex offender registration "may be the most significantly stigmatizing and longest lasting effect arising from the fact of conviction"). But the inescapable fact of the matter is that registration and all that flows from it is the product of a conviction, similar to impacts on voting rights and firearm ownership, and has very little to do with the actual adjudged sentence. As the CAAF has held, "[s]ex offender registration operates independently of the sentence adjudged and remains a collateral consequence." *Talkington*, 73 M.J. at 216–17. We recognize that post-trial events may warrant sentence relief when a legal deficiency or error exacerbates an otherwise appropriate sentence. *United States v. Gay*, 75 M.J. 264, 269 (C.A.A.F. 2016). Yet, Appellant identifies no such deficiency or error in his case—instead, he takes issue with the fact Texas authorities are enforcing existing law and regulations. To the extent Appellant argues the registration requirements are onerous or unjust, a more effective avenue for recourse runs through his elected representatives and courts with jurisdiction over those requirements. For our purposes, we give Appellant's sex-offender registration its appropriate weight in conducting our Article 66, UCMJ, review, as we did in *Parker*.

Because we are setting aside Appellant's convictions for two specifications, we must determine whether we should remand his case for a new hearing on sentence or exercise our "broad discretion" and reassess the sentence ourselves. *United States v. Winckelmann*, 73 M.J. 11, 13 (C.A.A.F. 2013). If we determine to our satisfaction "'that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of prejudicial effects of error . . . .'" *Id.* at 15 (alteration in original) (quoting *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). In making this determination, we consider whether: (1) there were dramatic changes in the penalty landscape; (2) Appellant was sentenced by members or a military judge; (3) the remaining charge encompasses the originally charged conduct; and (4) we are familiar with the remaining offense such that we can reasonably determine what sentence would have been imposed at trial. *Id.* at 15–16. Here, Appellant was sentenced by a military judge, and the remaining offense of abusive sexual contact was entirely divorced from the alleged communication of indecent language. The first offense carried a maximum sentence of seven years of confinement and a dishonorable discharge, while the latter carried a maximum of six months and a bad-conduct discharge for each specification. Thus, there is a moderate, not dramatic, change in the penalty landscape. Appellant's sentence, however, is effectively capped at the sentence he was originally adjudged: four months of confinement, reduction in grade, a reprimand

and a bad-conduct discharge. *See* R.C.M. 810(d)(1). Finally, we are very familiar with the remaining offense, and we may reliably determine the sentence which would have been imposed for that offense alone. We determine Appellant's sentence for just the abusive sexual contact specification would have been no less than a bad-conduct discharge, confinement for three months, and reduction to the grade of E-1.

### III. CONCLUSION

The findings of guilty as to communication of indecent language in Specifications 1 and 2 of Charge II and Charge II are **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining findings of guilty as to Specification 3 of Charge I and Charge I are correct in law and fact and **AFFIRMED**. We reassess the sentence to a bad-conduct discharge, confinement for three months, and reduction to the grade of E-1. The findings of guilty, as modified, and the sentence, as reassessed, are correct in law and fact, and no additional error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

JOHNSON, Chief Judge (dissenting in part and in the result):

Because I believe the evidence is both legally and factually sufficient to sustain Appellant's convictions for communicating indecent language in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934, as alleged in Specifications 1 and 2 of Charge II, I respectfully dissent.

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (internal quotation marks and citation omitted). The military judge who received the evidence at trial found the Government proved Appellant's guilt beyond a reasonable doubt. However, the majority finds the evidence fails to meet the "very low threshold to sustain a conviction" as legally sufficient. *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). I disagree and conclude a rational factfinder could conclude the Government proved the elements beyond a reasonable doubt.

In order for Appellant to be found guilty of these offenses, the Government was required to prove: (1) Appellant communicated certain language, charged as "sexually explicit poetry;" (2) the language was indecent; and (3) under the circumstances, Appellant's conduct was to the prejudice of good order and discipline in the armed forces. *See Manual for Courts-Martial, United States* (2016

ed.) (2016 *MCM*), pt. IV, ¶ 89.b. "The language must violate community standards." 2016 *MCM*, pt. IV, ¶ 89.c.; *see also United States v. Green*, 68 M.J. 266, 269 (C.A.A.F. 2010) (explaining the requirement that the language violate community standards is not a separate element of the offense). Language is "indecent" if it is "grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought." 2016 *MCM*, pt. IV, ¶ 89.c. Of course, under this definition, the communicated language need not have *all* of the aforementioned qualities in order to qualify as "indecent." *Cf. United States v. Negron*, 60 M.J. 136, 144 (C.A.A.F. 2004) ("[P]aragraph 89.c presents two different definitions to measure speech that may be a crime, dependent on the context in which it is spoken."). Put another way, language that is "grossly offensive" to "propriety" due to its "vulgar . . . nature" meets the definition of indecent under the UCMJ, provided that the language also violates the standards of the military community. 2016 *MCM*, pt. IV, ¶ 89.b, c; *see United States v. Hullet*, 40 M.J. 189, 191 (C.M.A. 1994).

The *Manual for Courts-Martial* does not include a definition of "vulgar," and there appears to be little specific discussion of the term in military case law. However, in the absence of a specific statutory definition, military judges are able to give words their ordinary meaning. *See United States v. Andrews*, 77 M.J. 393, 400 (C.A.A.F. 2018) ("[Q]uestions of statutory interpretation should 'begin and end . . . with [statutory] text, giving each word its ordinary, contemporary, and common meaning.'") (second and third alterations in original) (quoting *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017)). Relevant ordinary definitions of "vulgar" include "[l]acking of cultivation or refinement,"[1] and "morally crude" or "offensive in language."[2]

The indecency of a communication depends on "the context in which it is made." *Green*, 68 M.J. at 270 (citation omitted). "[T]he context of a communication is critical to any determination of indecency. [ ] Words that are innocent or appropriate in one context may take on an indecent meaning in another." *United States v. Knarr*, 80 M.J. 522, 532 (A.F. Ct. Crim. App. 2020), *rev. denied*, 80 M.J. 348 (C.A.A.F. 2020).

I acknowledge the Government was not able to introduce the exact text of the sexually explicit poem Appellant read to several noncommissioned officers (NCOs) in their workplaces in August 2018, and that the four witnesses who testified about Appellant's indecent language had imperfect memories of the

---

[1] BLACK'S LAW DICTIONARY, *vulgar*, (6th ed. 1990).

[2] MERRIAM-WEBSTER, *vulgar*, https://www.merriam-webster.com/dictionary (last visited 23 May 2022).

incidents. However, I find the witnesses' testimony to be generally credible and, importantly, not significantly inconsistent. Taken together, the testimony of Staff Sergeant (SSgt) CR, Technical Sergeant (TSgt) SD, SSgt EG, and SSgt SD demonstrates Appellant's poem described the perspective of someone pursuing unwanted sexual activity with an unwilling female, including references to touching her breasts and genitalia, and including specific phrases to the effect of "rubbing her clit" and "just stick the tip in."[3]

I believe a rational factfinder could conclude the communication of this language, *under the circumstances*, was grossly offensive to propriety due to its vulgar nature and violated community standards, and was therefore indecent. In addition, a rational factfinder could further conclude the communication was prejudicial to the maintenance of good order and discipline.

Appellant read his sexually explicit poem, or a significant portion of it, on two occasions on or about 2 August 2018. First, Appellant read the poem to SSgt CR, a female NCO who was not a close friend and who was meeting him in an on-duty, official capacity for a medical appointment. SSgt CR testified the poem made her feel "shocked" and "uncomfortable." She interrupted Appellant to stop him. She believed Appellant's conduct needed to be reported and addressed. Among others, SSgt CR informed her own officer-in-charge (OIC) of the incident, as well as Appellant's acting first sergeant. In addition, SSgt CR warned a female Airman who worked in her section that if Appellant came in, the female co-worker should have a second person present or leave the door to the room open. As a result of SSgt CR's report, Appellant received a letter of reprimand on 17 August 2018.

Second, Appellant read the poem to a group of four other NCOs,[4] with whom he worked but who were not close friends, on duty in a common work area accessible to customers. TSgt SD testified Appellant's words "surprised" and "disgusted" her, and were "grossly offensive." TSgt SD exchanged a look with a customer—another NCO in uniform—who heard Appellant as they were passing by, and who had a visible negative reaction to Appellant's words. TSgt SD opined that Appellant's conduct was prejudicial to good order and discipline and made TSgt SD not want to "associate" or speak with Appellant, despite the fact that they were required to work together. SSgt EG testified Appellant's

---

[3] I recognize only SSgt CR recalled the latter phrase, and it is possible Appellant did not get that far when he recited the poem to the other group of NCOs before they interrupted him. Whether or not Appellant read both phrases or only the first to the group of NCOs does not alter my conclusion that both Specifications 1 and 2 of Charge II are legally and factually sufficient.

[4] Three of the four NCOs testified at Appellant's trial.

sexually explicit words "shocked" and "bothered" her and made her "uncomfortable;" she told Appellant his language was "not appropriate" and walked away from him. SSgt SD testified that the poem described the speaker touching a woman's genitalia although she wanted him to stop; he testified he was "taken aback," and the other NCOs present told Appellant to stop. SSgt SD testified Appellant's first sergeant asked him to write a memorandum about the incident, in which SSgt SD described the poem as a description of a man forcing himself on a woman. All three witnesses generally agreed the sexual language was not the type of language used in their workplace.

I conclude a rational factfinder could find Appellant's recitation of a sexually explicit poem describing unwanted sexual contact from the perspective of the perpetrator was, under the circumstances, including the time, place, and audience, and the listeners' reactions, grossly offensive to propriety due to its vulgar nature and violated the standards of the military community, and was therefore indecent. Moreover, I conclude a rational factfinder could find Appellant's actions—which *inter alia* led SSgt CR to report him to her OIC and to Appellant's first sergeant, made SSgt CR specifically warn a female Airman about Appellant, caused TSgt SD not to want to associate or speak with Appellant, and resulted in Appellant's first sergeant investigating the matter and obtaining statements and Appellant receiving a letter of reprimand—were to some extent prejudicial to good order and discipline.

The majority states that SSgt CR "conceded" that if a friend of hers had read the same poem to her in a different setting, she would not have found it worthy of reporting. With due respect to my colleagues, I fear this summary does not adequately capture SSgt CR's testimony. Accordingly, I have set out the relevant portion of her exchange with trial defense counsel below:

> Q [Trial Defense Counsel]. We wouldn't be here if he was your friend?
>
> A [SSgt CR]. That's not an accurate statement.
>
> Q. We wouldn't be here, ma'am, if he was your friend; yes or no?
>
> A. Yes.
>
> Q. Because you never would have reported it?
>
> A. We would be here.
>
> . . . .
>
> Q. Ma'am, to circle back, it's your testimony that we would not be here if [Appellant] was your friend?
>
> A. That is not what I said.
>
> . . . .

Q. And [the defense team] asked you [during a pretrial interview] if [Appellant] was your friend if we would be here.

A. Y'all asked me had the environment been different, had we not been in a professional environment, had we been off base, been friends for a long time that --

Q. Ma'am, that's not my question.

[Military Judge]: Just stand by. Counsel, don't interrupt the witness when they're talking, so ma'am, please continue.

A. Y'all had asked me if we had been friends, been acquainted, been friends hanging out outside of work; been that kind of friends; had he asked me in that environment, nonprofessional environment, to read a poem to me and he had read this to me that is when I said all of those things, those possibilities that were not true whatsoever, then "no" I probably would not have reported because it would take the professional environment -- the fact that we were not acquainted, we were not friends, we were not anywhere near knowing each other whatsoever, then I would not have felt the need to report it. However, if you take all of those things into account; we didn't know each other, we were not friends, he doesn't know me, I don't know him, we've met a total of maybe 15 minutes very cordially, and I was at work, I was at [sic] uniform, we were in a professional environment, not just physically but the whole situation taken into account, that's what makes it inappropriate. Had we been close friends, hanging out outside of work and he asked me for some advice as a friend and we had known each other that well, then on that level then I don't think that we would be sitting here today. However, that is not the situation that it was.

As we have said before, the context of a communication is critical to the determination of indecency. *Knarr*, 80 M.J. at 532. Sexually explicit terms and descriptions of sexual acts may be appropriate in some contexts, just as otherwise benign language may be indecent in other particular circumstances. SSgt CR essentially testified that if Appellant's communication was stripped of all of the context that made it grossly offensive to propriety under the circumstances in which it was actually made, then she "probably" would not have reported it. But that concession is practically irrelevant.

The majority asserts they are not willing to "broadly paint any discussion of sexual conduct among adults as indecent language under a theory that someone, somewhere might be aroused by it." Neither am I. However, the definition of indecency does not require the language to be actually or potentially sexually

arousing. I also agree that many things that are inappropriate to say in the workplace are not "indecent." However, language that is grossly offensive to propriety because of its vulgar nature and violates the standards of the military community *is*, by definition, indecent. For the reasons stated above, I believe a rational trier of fact could find the elements of Specifications 1 and 2 of Charge II proven beyond a reasonable doubt. Moreover, I am convinced the Government introduced sufficient evidence to prove these specifications. Accordingly, I would affirm the findings and sentence.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court